morning is 21-40718 Rose v. Aaron. Mr. Allen. Thank you, your honor. Good morning. May it please the court, Thomas Allen for appellants Lori Aaron, Philip Aaron, Aaron Ranch, and Jay McLaughlin. Joining me at the council table is co-counsel Don Gordon. Mr. Allen, thank you. Before I begin, I would like to offer a word of thanks to the court and in particular the court staff for their care and attention in assisting all the lawyers in navigating what has been a complicated procedural matter up to and including the structure for oral argument and I'm certain opposing counsel joins me in those sentiments. We are very proud of our staff. Rightly so. So in my time before the court, I would like to focus on the district court's reversal of the bankruptcy court's damages award in favor of the Aarons on their breach of contract claim against Carol Rose. Of course, I'd be happy to answer any questions the panel may have about the remaining issues, which we will otherwise submit on our briefs. This breach of contract damages award was not conjured from thin air. It was the product of a nine-day bench trial involving the testimony of numerous witnesses. As the finder of fact, the bankruptcy court evaluated the credibility of these witnesses, weighed the testimony, and issued lengthy, detailed findings and conclusions. In its ruling, the bankruptcy court found time and again that the Aarons and their witnesses were credible, Rose and her witnesses were not. The bankruptcy court found that Rose had breached her agreement with the Aarons in multiple ways and Rose didn't even appeal liability. And the bankruptcy court found that the Aarons had been damaged. Citing in the court's words, credible, specific, not contradicted evidence, the court made a conservative damages award of 1.1 million dollars, even though the Aarons' losses were much greater. The district court, sitting in its appellate capacity, wiped that damages award away, and it did so by fundamentally second-guessing the trier of fact. That ruling cannot stand. To begin with, the district court's ruling was based on a fatally flawed premise, that it was reviewing this damages award de novo. Damages awards are findings of fact reviewed for clear error, and that's true even if they involve mixed questions of fact and law, as long as those involve primarily factual work. And that is exactly the kind of work the district court did in its opinion. While the court, to be sure, the court first addressed a question of law, measure of damages under Texas law, but the court did not stop there. The crux of the district court's opinion was that under Texas law, the bankruptcy court, quote, failed to account for the payments that the Aarons would have made in their deal with Rose had Rose not breached the agreement. In other words, the question was, put plainly, did this damages award put the Aarons in a better position than they would have been had Rose not breached the lease? The bankruptcy court concluded that it was, that was not the case. The district court, however, framed this as a de novo question. It was a factual question to be reviewed de novo. Were the historical facts found by the bankruptcy court sufficient to meet the legal standard? That is a question to be reviewed for clear error. So had the damages award should have been affirmed. Why is that? Well, because under clear error, a damages award need only be plausible in light of the record in its entirety. It does not have to be calculated with mathematical certainty, and when it is based as it was here on credible witness testimony, it is entitled to extra deference, but the district court showed no such deference. First, the district court simply misread the bankruptcy court's ruling. The district court said that the bankruptcy court failed to account for the saved payments under the party's agreement. That is incorrect. In findings and conclusions 17 and 18, the bankruptcy court expressly addressed this issue, concluded that the damages award, concluded, I should say, that whatever savings the Aarons realized because of Rose's argument. And second, there is plausible support, which again is all that's necessary under clear error review to support this damages award. Now briefly, as to the $1.1 million itself, which the district court does not really purport to rule on, but criticizes in a footnote in its opinion, there is amply plausible evidence to support those amounts. As we discussed in our brief, the testimony of Lori Aaron provided a conservative estimate which the court found specific, credible, and uncontradicted. The bankruptcy court was entitled to believe her. The bankruptcy court was entitled to credit her estimate based on her personal knowledge, which the court found to be credible. The same was true of the testimony by Jay McLaughlin, the horse trainer, who testified about why all these improvements were necessary. The Aarons were going to launch a high-end quarter horse business. They had to have safe fencing. They had to have new infrastructure facilities such as pads and paddocks. They had to have laboratory equipment if they were going to operate a bankruptcy court. The bankruptcy court found those numbers credible, found the improvements to be necessary and reasonable. It was not the district court's role to second-guess those fact findings. But the heart of this appeal really is the second issue, the question that in our view the district court got wrong. Did the improvements to the Commerce Ranch put the Aarons in a better position than they would have been had Rose not breached the deal? And the answer is no, it did not. Now, to unpack that answer a little bit, it's important to remember what the deal was. The parties speak, including us, in shorthand about saved rent. But in actuality, these payments that the Aarons would have made were for far more than just the temporary use of property, like renting an apartment. Rose tries to oversimplify the deal and say, well, this was just a deal for the temporary use of property, the end. But that's not the case. So what were the Aarons, rather, getting for this deal? First, they were getting the use of the Gainesville Ranch. This was a ranch that already had the high-end equipment and fencing and infrastructure necessary to run and launch the Aarons' quarter horse business. It also had a desirable location. There is ample testimony at trial from Lori Aarons saying how important location was as a driver for their decision to go into this deal. But the temporary use of the ranch was not all the value that the Aarons were getting. Another major component was that this was not just a lease, but a lease with an option to buy. They had a right of first refusal, and under that right, at the end of five years, 70 percent of their payments would be converted into a down payment. In other words, rent payments, lease payments, would become equity to the tune of $101.75 million. That option had real value, value that was lost forever when Rose reached the agreement. The third component of this agreement was the role of Carol Rose herself, that she was going to provide consulting and management services, something Lori Aarons testified was absolutely critical to the success of this business. And Rose would bring her reputation, her status, her expertise. These were all a unique part of the, quote, package deal. And recall the bankruptcy court concluded that this was all one deal. This wasn't three deals, all one together. This entire deal was, had an absolute value of $2.5 million. So when Rose breached the deal, the Aarons lost $2.5 million in value. The key fact is that the $1.1 million awarded by the bankruptcy court was only a partial remedy for that lost value. Only one component, the improvements, the fencing, the equipment, the paddocks and pens, it did not compensate them for the other lost value. It didn't give them an option to buy. It didn't give them equity to buy this uniquely attractive facility. It certainly didn't give them the location. And we all know how important location, location, location is. And it did not give them Carol Rose's unique role in helping to bring this business to fruition. So there was, if you want to do the back of the envelope math, roughly $1.4 million in lost value still sitting on the table. So it is by no means the case as Rose has argued that these improvements were a windfall to the Aarons, that the Aarons were somehow in a better position than they would have been. There were indeed other losses which the bankruptcy court noted as well, that the Roses used their existing facility as opposed to, and couldn't use it before. They were going to have two ranches, then they had one. The bankruptcy court noted that they spent more money up front than they would have otherwise under the terms of the bargain. In short, this evidence was all before the bankruptcy court and must be considered under clear air review. The bankruptcy court again was entitled to look at all of this evidence in its entirety and conclude that this aggregate body of losses, which were attributable to Rose's actions, at least accounted for any moving forward with the deal. The district court didn't grapple with these issues. It didn't even apply the correct standard of review. So we would submit the court should reverse the district court and reinstate the bankruptcy court's damages award, which it awarded only after a nine-day bench trial based on credible witness testimony. Now, alternatively, we have argued that if the court discerns any deficiency in the bankruptcy court's analysis, at a minimum, the issue of damages should be remanded back to the bankruptcy court. Now, this is not, as Rose has suggested, simply an exercise in mulligan taking. It is rather a vindication of the respective roles of the trier of fact and of reviewing court. This is entirely consistent with this court's authorities. For example, in the ENI U.S. operating case, which both parties cite, there was a case where the trial court did not adequately explain the evidence supporting its damages award. So it remanded for additional fact-finding. We also cite, in particular, the N. Ray Mandel case, and I believe Chief Judge Richman was on the panel in that case. That is another bankruptcy case where the bankruptcy court issued a damages award that did not appear to be based on any of the damages models offered at trial, but nonetheless, because there was some damage sustained, the court remanded. Counsel, can we talk about the remand for a second? Because the district court does remand the case to the bankruptcy court. It does, Your Honor. What is your understanding of what the district court expects to happen? Well, the district court doesn't tell us in its order. We do know that the district court did not invite the bankruptcy court to engage in a further analysis. It simply reverses and says nothing more. So while we don't know, it appears that the district court was remanding to the bankruptcy court simply for an entry of judgment. So you would take nothing on the million-dollar breach of contract. There's no TTLA violation, so obviously you don't get the $61,000 there. Presumably, you're not prevailing parties, so you don't get fees there. And McLaughlin's $51,000 estimate for the certificates or whatever, that those go to zero. So it's just a ministerial... Out of an abundance of caution, we must assume the worst-case scenario, that that was the important meaning of the district court's ruling. Suppose we agreed with you on everything in the appeal, so your four presented issues, just hypothetically. Can we reinstate the fee award, or does the fee award have to go back? Well, we certainly stand by the fee award. However, we also recognize that the remand rose appealed the fee award separately to the district court. The district court did not address it substantively. So we recognize that in this court's normal course of proceedings, the district court would review that in the first instance. But you haven't cross-appealed the fee award because it's too low or anything? No, Your Honor. I believe we were simply appellees in the district court on both the substantive claims and the attorney's fee awards. And the fee award is still in the district court? I'm sorry, Rose's appeal of it? Well, I mean, no. Separately, the district court ruled that because we were not prevailing parties on our claims, therefore, the attorney's fees were reversed as well. But it did not substantively address the merits of Rose's appeal. Sorry, I misunderstood your first answer. My apologies, Your Honor. No, it was on me. So, in short, to just finish on remand, just as in Ray Mandel, the same is true here. The bankruptcy court found that the errands were, first of all, it found that Rose breached the agreement, and there is no appeal of that. The bankruptcy court found that the errands suffered damages as a result. The bankruptcy court addressed the question of the saved payments in its findings and conclusions. That is an inherently factual question. If there is any doubt, let this inherently fact-based inquiry be resolved by the fact finder. Thank you. Ms. Hubbard? May it please the court. Caitlin Hubbard here with John Casey and Jacob DeCaretry on behalf of Carol Rose and Carol Rose, Inc. as appellees. The district court, as the court knows, identified a number of legal defects in the bankruptcy court's award. And we would submit respectfully that each of those are correct, but this court may affirm by reaching one. Under any standard of review, the bankruptcy court's damage model is incorrect, and the errands who pursued that model over my client's objection did not adduce any evidence for this new weather impacts theory that they are pursuing for the very first time in this court. Ms. Hubbard, before we get too far down the road, just to start with the jurisdiction that we have under Section 150AD, do you have any disagreement with your friend on the other side that the remand ordered by the district court is purely a ministerial one, that it's just for entry of judgment in your favor on everything? No, Your Honor. And actually, I was aware of this remand issue, and so that's why I addressed it specifically in my brief. I wanted to dispel any concerns about jurisdiction in this court. And typically, this remand issue, there are special instructions to have further proceedings. And in this case, we just got a general remand without instruction. And I think the way to really this question of jurisdiction intersects with this court's authorities on how to read an opinion, and specifically the city of San Antonio case that says that you look to the substance over the form of the decree. And here, what we know from the substance is that every single holding, including the alternative legal sufficiency holdings, are all rendition holdings. You don't get a redo for that. And the district court, in our view, went quite specifically and quite carefully through every issue and So we would suggest that the remand is for just ministerial entry of judgment, or we ask the district court, if you reverse in our favor, then please remand, vacate the attorney's visa opinion, and let's have a new discussion of who is the prevailing party. And so, the fact that the remand isn't surprising to us. So, given that Ms. Rose doesn't appeal the breach of contract liability finding, so you agree, at least legally, that she's liable for the breach, you just think that the damages are zero? Well, yeah. I mean, obviously, as counsel for my client, I disagree with the liability finding, but, you know, we, there were a number of legal issues in this case on both of them, the Weston case that settled as well, and we have limited briefing, so we raised the issue that we thought was most effective and required rendition in our favor. So, personally, I disagree with the liability finding, but legally, we're not appealing that. The question in this case is just the measure of damages, and whether there's legally sufficient evidence, even if that measure is correct. So, you presumably say that she gets a dollar? I'm sorry, that the errands get a dollar? That they get a dollar? Yeah. I mean, obviously, it can't be zero, so if you're if it's legally sufficient that she breached the contract, then they would get some nominal damage. Well, no. I think it's zero. They didn't prove any damages. Interesting. I mean, I suppose that would undermine the liability for the breach in the first place, but I take your point. Well, yeah. I mean, if you look at liability as you also have to prove your damages, then, yeah, we would contest liability. I think the way the parties have framed it in this case is, are there damages? And we say there's none. I mean, truly, under the measure of damages, which is a legal question, both under U.S. Bank and under this Court's more recent decision in E&I, we know. And this has been the law in appellate practice for decades, that conclusions of law underlying a damages award are reviewed to know about. U.S. Bank does not change that. I really think that this standard of review dispute, I mean, it's premised on several assumptions that are all wrong, right? You only get to clear error review to say, well, let me count up these damages for other impacts if they were actually pleaded for and there was evidence to support them and proved. A clear error standard is not a cure-all, right? You can't just shrug your shoulders and say, well, we also have these other damages, and that's effectively what's happening in this appeal. And if you go back and you look at the Bankruptcy Court's opinion, I mean, counsel, Mr. Allen, said that the crux of the District Court's decision is that it found that Bankruptcy Court failed to account for the $2.5 million in saved rents. It did. If you go and look specifically at the Bankruptcy Court's opinion, and I believe this is finding of fact 259, the Bankruptcy Court said, the errands are seeking the cost of the permanent improvements to their property as damages in this proceeding. Conclusion of law 9, the total amount the errands claim relating to these improvements is $1.1 million. And conclusion of law 19, the errands have established damages for breach to the lease in the amount of $1.1 million. What we're hearing on appeal is a clever math trick, right? It's when everybody proceeded from the pleadings, the evidence, and even in the District Court, page 29 of their brief, told the District Court that the Bankruptcy Court correctly refused to credit the $2.5 million in saved rents, which, by the way, doesn't account for all of the other expenses the errands were obligated to pay under this triple-net lease. That is what the expectancy model requires. As this Court said in E&I, it is a hypothetical, non-breach world. And I would respectfully submit that there were damages models that they could have pursued, but they didn't do it, presumably because those models didn't lead to any damages. And what was the evidence that Ms. Rose put on in front of the Bankruptcy Court about damages for the breach? Or did she just contest and say, that's not good enough, $1.1 is not sufficiently detailed enough? Well, we objected to legal sufficiency, but we objected to the Model 2. We said this produced a windfall, and this isn't the correct measure of damages. And that was the argument that we took to the District Court as well, and it's what we prevailed on. Can I ask you a question about the TTLA claim? Of course. So, what is the best authority for the idea that someone doesn't violate the TTLA when they impound horses at gunpoint and demand $60,000 in money that she concedes she's not entitled to? I find this, like, extraordinary. I assume you want me to take your hypothetical at the word of your characterization. Well, it's the way the Bankruptcy Court found it, as a matter of fact. So she says, give me $100,000, you owe me $40,000, but the $60,000 is a ransom. Well, not quite. I mean, what the Bankruptcy Court found is that my client's counsel sent a stableman's lien, that's Plaintiff's Exhibit 215, I believe, in the record, that had a detailed line of cost. She found that my client did not commit theft by deception because the errands had every single delineated charge. Her counsel sent that less than, I mean, hours later. The errands paid. That amount came and picked up the horses. The stableman's lien was sent at 3 p.m. They came the same day. That's in the stipulated facts to come and get their horses. Well, actually, let's get out of the hypothetical for a second. Just give me your best argument as counsel for your client. What was the $60,000 for? The $60,000 was two things. I think that's a really good question that you need to focus on because it impacts intent in this case. The $60,000 was for, there was one large charge for feed during the month of September and there were other charges for expenses that were owed under the lease. I thought that was the $40,000. I thought the whole point of the $40,000 was for the stuff, the actual taking care of the horses. The $40,000 is for the stuff actually taking care of the horses. The $60,000 is for amounts that were owed under the lease that they had to pay for as expenses on the property. There was also, however, a feed bill for about $25,000 that was not included in that $40,000. So if you actually go and look at that delineated list, that is. Now, what we know from the record, and opposing counsel talks a lot about the nine-day trial, but this was an afterthought. I mean, there are very few pages in the record on the stableman's lien theft issue. Very limited evidence. And all we know from the undisputed facts is that my client felt she was owed money. This isn't your typical theft case, right, where you know you're not and you try and go and get it. She thought she was owed money. She prepared a list. She's not. The bankruptcy court found that she credibly testified that she is not an office person, that she relies on her employees and her bookkeepers and her counsel, as most clients do. How did she get the armed guards? The armed guards? Or armed security? Well, that's not really legally relevant. Well, I mean, this is not exactly the same way that one would normally impose a lien, right? I mean, that's kind of... That's entirely separate. The armed guards is the lockout. That's the breach of the lease. The stableman's lien is, I'm keeping your horses until you pay me the amounts that the errands admit were partially owed. So what we know from the record, again, is she prepared a list of, here's everything I think I'm owed, with the assistance of her bookkeepers. She gave it to her counsel. The record is absolutely undisputed. Absolutely undisputed that her counsel decided what to include in the lien. And respectfully, that's not surprising. So if the theory today is, well, and I really do think this is what the district court understood it as, if the theory is well, she misused a stableman's lien to get amounts that were owed under other contracts, right? So kind of like you misused a legal vehicle, then she needed to know the contours. They needed to prove, it was their burden to prove intent that she knew the legal contours and she intentionally transgressed them. There is not a single question in the record to my client on that issue. And they, by the way, they also had her counsel as a witness in this case. They didn't ask him either. And now they're trying to impute his intent to my client under the law when they didn't even ask him a single intent question, much less prove it, right? So I think that is the fundamental defect. I think there are scenarios where, you know, theft by coercion with a threat to commit an offense, that happens if, you know, someone points a gun at someone else and says, give me your money, right? And I understand that. But that's not the situation that we have here. Surrounding the horses with guards. Well, but the surrounding with horses with guards is not relevant to the stableman's lien. Why is it that you would have to ask questions directly on the people's intent? Why would you have to answer those would be questions that, if you found them not to be credible in other things, and you just found them overall not to be credible at all, then you don't have to ever ask them to give them a chance to deny that they had the bad intent. You can infer as the fact finder from all the other surrounding things. I don't understand why the fact that there aren't direct questions on this means that the fact finder can't find it. Because, you know, you don't ever have to ask the question that says, you know, you can't handle the truth. That never has to be answered in the trial. In most trials, it never is. Well, and that's right, Your Honor. You can look to surrounding circumstances, but I'm not sure what the surrounding circumstances are that they're relying on. Is it the credibility finding about a dispute in the arena? You know, that's not relevant to the show. But you will find that she's not credible, no offense, but not credible in many dealings related to all this stuff. And that's, why isn't that good enough to say that this wasn't just some sort of bookkeeping accident? I'm just wondering. I'm not saying that that's what the court did, but why isn't that one interpretation? I think you can look to surrounding circumstances, and to your point about bookkeeping accident, I think that, respectfully, I think it misunderstands the theory that the courts below proceeded on, which was did she know that certain amounts that were presumably owed under other contracts, because there was no finding that they weren't owed, and certainly they have to admit that there were expenses owed under the contracts. They didn't state a breach contract claim to recover it. We didn't state a breach contract claim because we got it. So, you assume that those amounts were owed, except for these minor duplicate charges, right? But the bulk of it is amounts owed under other contracts. So, under the theory that they proceeded on, they needed to show, not that she had intent to take their money, but she knew that she could not use this legal vehicle to get it. And there is nothing in the record on that. There's no surrounding circumstances to show that. But that she didn't care whether or not she could use it or not. But she was going to get her money no matter what. Well, she felt it was owed. Yeah. They don't have to show that they knew specifically the numbers. They just have to show that she didn't care at all. She's going to get all she can get. And that's what they have to show. I think, Your Honor, that they have to show that there was a threat to commit an offense. And what we know at that time, and so the district court held, there was an offense because she had a legal right to retain the horses. And with respect, it's kind of intent conflates into the causation analysis here. Because what we also know is that this is a wonderful protest, but this is really a post hoc dispute about which amounts were owed when, right? I mean, what we know is that the errands pleaded to recover the entire amount. Only later, after they signed a joint pre-trial order saying we should get the whole $100,000, did they go piecemeal through it and say, you know what, actually, I think we did owe that, we didn't owe that. And if you look at closing argument, you know that opposing counsel said, well, we crunched the numbers, Your Honor. So this is not a case in which there was effective causation. Even assuming my client intended to threaten to commit an offense, the errands didn't realize it. This was a world in which the parties were vehemently disputing amounts owed to each other, and where my client rightfully believed that those amounts were owed under other contracts. And by the way, the errands have never tried to get it back under breach of contract because they were owed. So we would respectfully submit that this is not threat by coercion, and we would point the court to the Jacobs v. State case. And, you know, Judge Oldham, you asked earlier about what's your best authority. There's just not many authorities here. Can we go back to the breach of contract thing, because I realize that's the main quarter horse in the arena. What I don't understand is you say over and over in the brief, well, they're better off than they would have been under the lease, but they don't get to be, they don't get the location, they don't get the consulting services, they don't get, you've denigrated as the court, I don't mean to be pejorative, but you call it the other impacts theory over and over again. But I don't understand how that's not a valid expectancy measure. The other impacts theory? Yeah, is the theory just that this isn't what they did below, and you shouldn't let them to, again, pardon the terrible horse puns, but shift horses midstream, or is it that, in fact, if they had been arguing this from the beginning, it would just not be a valid damages model? It wouldn't be a valid damages model because they didn't plead it or prove it. I mean, that's the problem. Really, what happened below is they said, we've got $1.1 million in the improvements. The bankruptcy court found we've got $1.1 million in damages for breach of the lease in improvements. That was the finding. And the district court, they say it's reliance damages, didn't have to credit the other amounts. They come to this court, and they say, actually, for the first time, the bankruptcy court did apply an expectancy model, and it did account for these safe rents by finding that other impacts offset them. Here's the problem with that. I mean, it's built on a house of cards. Did you plead for the other impacts damages? Did you put on evidence for the other impacts damages? I guess what I'm getting at is that... And they didn't. I guess the question then is, I mean, it's really hard to read this record. I'm just being candid with you. It's really hard to read this record and say that the errands are made better off by the breach. Really hard. And so, what I'm trying to figure out is, is the theory that, like, no, they should go back to the bankruptcy court, and they should be able to put on this other impacts thing because they didn't get the location. They didn't get the consulting services, and they didn't... So the theory is then, no, you had your bite at the apple, and you don't get a second one. You should have done that the first time. You may have been damaged, but you're not going to be able to go back and do it now. I don't... Well, one, I will tell you, I have run through hypotheticals. I have to make assumptions, right? Really, what they should have done is do a rent differential model or, you know, even under a substitute transaction model, they should have had an expert come in and say, here's the value of the use of the Commerce Ranch for five years. They didn't do that. They just straight up said, I want the $1.1 million. Rose owes me a blank check for four years' time for whatever I construct. That was a problem on many levels. And what we know from this court's authorities, published authorities, In re Letterman, there's another... The Ware case that we cited in our brief, In re Mendel, that Chief Judge was on, that's an unpublished case, and it's materially different from this case. There was not an issue with the damages model and no evidence to support damages under a correct model. That's this case. In In re Mendel, the issue was that they both sides put on evidence of damages. It was a fraud case. It was one of those cases where damages are inherently speculative, unlike this case. And the bankruptcy court disregarded both models and just picked numbers out of thin air. This court reversed and remanded for a new trial because it wasn't that the parties had failed to prove their damages model. It's because the bankruptcy court hadn't really adopted either of them and just picked a number without explanation. And if you look to the authorities that Chief Judge cited in her footnote, there's actually a published one called Great Pines. And that case is basically this case. It's the same theory, that when you proceed on a measure of damages and you have a full and fair opportunity to litigate over my client's objection, right? It's not like they didn't have notice. Then you're done. You don't get to play litigation by whack-a-mole and go back and try again under the theory that's not as favorable to you. Could you say, just imagine that the client has $3 million in damages, but they're going to have to hire these experts and run these rent differential models. This could be really complicated. There's going to be a big battle of the experts. It's going to cost a fortune in fees in order to do it. Can they just say, look, I'm not going to go for my full $3 million. I'm just going to go for $1.1 because it's very easy for me to prove that these are actual expenditures, this is real cash that I paid. And I know that's easy to prove. And it's less than the $3 million, so how can my party I'm not trying to understand, unless there's a rule in bankruptcy that's different than in other forms of civil litigation, I'm trying to understand why that would be a problem. As I understand, first off, you're assuming that they did suffer $3 million in damages and that obviously wasn't proven. Yes, that's what I mean. It's like, let's just do this hypothetic. I shouldn't have used $1.1 because it makes it too much like this case. But you know what I'm trying to say which is, can you just get less than you otherwise would? If you prove it with reasonable certainty, I think you're getting to the legal sufficiency of their actual proof on damages. Yeah, if you prove it with reasonable certainty, but they didn't. I mean, there wasn't a single piece of documentary evidence in this case. I'll remind the court that the focus of the Aarons case was fraud, right? So we're here on this breach of contract case, it's really not surprising that there wasn't much there. There was not a single piece of documentary evidence. And the explanation for that is, well, it was chaos. Well, these are major structures they built. You have invoices, you have credit card statements, you've got something. And these are just guesses. This is no different from the NutriSep or the Sanders cases that we cited in our brief. And they didn't meet the reasonable and necessary. And that's not just a fact finding when you look at whether there's any evidence at all. There's not. Now the bankruptcy court said it's reasonable and necessary, but there's a bar and a conference table in those photographs. We don't know what any of this is for. And we objected on each of these grounds. So yeah, I would say that even if you give reasonable assumptions on a damages model, right? Let's say that we had an expert that took the interest rates at the time and decided what the reasonable rental value of their improved property would have been. My guess is that it was about the same amount or less. There's a reason they didn't proceed on these. They shouldn't get another shot after going to two courts and saying, here's our damages, and this is totally kosher under Texas damage model, and then come back when a court catches them and say redo. So Your Honor, for those reasons we would affirm if there's any other questions, I'm happy to answer them in my 30 seconds left. Thank you. Briefly on the breach of contract question and the damages award. First of all, I'll start at the end. When counsel was talking about the evidence of the improvements themselves, there was a bar there. What was the bar for? Those are factual questions for the fact finder. That is not a legal bar to recovery of damages. Not when the fact finder said the evidence was credible, said the evidence was specific, and awarded damages as a result. Judge Oldham, your question is a really good one. First of all, it is really hard to read the bankruptcy court's lengthy findings and conclusions and conclude that the errands somehow came out ahead in this deal. The whole tale of this really belies any suggestion in that regard. The errands always were consistent in seeking a conservative damages award. The $1.1 million in damages. That was always pled, that was always discussed, and this notion that the saved payments were not fully aired out. They were. The parties argued about that to the bankruptcy court. The problem for Rose is the bankruptcy court didn't buy it. The bankruptcy court, which was in the best position to assess the evidence and the witness credibility, didn't buy their story. It looked at the deal and said, I am awarding $1.1 million in damages based on the credible, specific, and uncontroverted testimony before me. I am concluding that that deal is not wiped away by any savings that the errands may have realized for not having to make these payments. Under a clear error standard overview, this isn't just shrugging your shoulders and hoping for the best. The question is, was the bankruptcy court completely out of bounds in reaching that ruling? Is that utterly outside the realm of plausibility? Certainly given the nature of the deal itself, as we discussed, and the other losses that the bankruptcy court identified. I would submit the answer is no. And that is why reviewing courts do not gap fill, do not put themselves in the shoes of the fact finder. But we'll look and say if the fact finder, certainly here, if the fact finder found that there was some harm at least, either affirm in deference to the fact finder's factual conclusions or remand. I would submit that In re Mandel, published or not, is absolutely on point because it demonstrates how this works. If the bankruptcy court, as fact finder, issues a damages award and there is a question about the propriety of that, whether be it the legal standard or be it the evidence, there is no dispute of breach. It is indisputable that the errands were harmed, contrary to Rose's position. That is when remand is appropriate. But we would submit that affirmance of the bankruptcy court's award, as I mentioned before, is appropriate. And finally, just a brief word in the 30 seconds I have left about the TTLA claim. The other amounts whether they were, regardless of the origin of those amounts, those amounts were not covered by the statute. The statute only allows you to keep horses for amounts owed for horse care. It is now beyond dispute that those amounts were not for horse care. You do not get to hold up the TTLA statute, or hold up the stableman's lien statute, say give me $101,000 or you don't get your horses back when you're only entitled to $40,000 for horse care. I see my time has expired. Unless the panel has further questions, we respectfully pray that the panel that the court reverse the district courts and reinstate the judgments in favor of the errands and Mr. McLaughlin. Thank you.